# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOHN JOHNSON,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:14-cv-2381-JHH** |
| **CITY OF BESSEMER; MAYOR KENNETH GULLEY; and PAUL SYX,** | ) ) | |
| **DEFENDANTS.** | ) | |

## MEMORANDUM OF DECISION

The court has before it two motions for summary judgment.  The first is the January 29, 2016 Motion (Doc. #43) for Summary Judgment filed by Defendant City of Bessemer.  The second motion is the January 29, 2016 Motion (Doc. #45) for Summary Judgment filed by Defendants Kenneth Gulley and Paul Syx.  Pursuant to the court's February 3, 2016 order (Doc. #49), the Motions were deemed submitted, without oral argument, on March 9, 2016.  After careful consideration, the Motions (Docs. # 43 & 45) are due to be granted in full for the reasons explained below.

## I. Procedural History

On December 11, 2014, Plaintiff John Johnson filed a <u>pro se</u> Complaint (Doc. #1) in this court alleging violations of his First Amendment rights, filed pursuant to

42 U.S.C. § 1983, and violations of Alabama state law against Defendants the City of Bessemer, Alabama, Mayor Kenneth Gulley, individually and in his official capacity and Fire Chief Paul Syx, individually and in his official capacity, and Fire Captain Johnny Eidson, individually and in his official capacity.   Specifically, Plaintiff claimed that Defendants violated his right to free speech by the following actions: (1) suspending him in response to his Facebook post, and (2) restricting his use of social media.  (Doc. #1.)  Johnson also claims that his suspension was an abuse of process under Alabama law and that the City's alleged inaction following certain workplace incidents amounts to negligence.  (Id.)

On February 16, 2015, the served Defendants[1] filed a Motion (Doc. #14) to Dismiss the Complaint.  After the court issued a briefing schedule (Doc. #16) on the Motion, however, on February 26, 2015, Plaintiff filed a First Amended Complaint (Doc. #17) through newly obtained counsel.  The court found that the pending Motion (Doc. #14) to Dismiss was moot.  (See Doc. # 18.)

On March 12, 2015, the served Defendants filed a Motion (Doc. #19) to Dismiss the First Amended Complaint.  Defendants argued that all of Plaintiff's claims were due to be dismissed under the two-year statute of limitations.   After

---

[1] Captain Eidson had not been served with a copy of the summons and complaint.  (See generally docket sheet.)  In fact, he was never served, and the court dismissed Captain Eidson without prejudice on February 3, 2016 for failure to serve.  (Doc. # 48.)

2

briefing by the parties (see Docs. # 24, 26 & Exh. 1 to Doc. #27), the court denied the Motion without prejudice because it was not apparent on the face of the First Amended Complaint that the claims asserted therein were the time-barred. (Doc. # 29.)

After that order, Defendants filed Answers (Docs. #30 & 31) to the First Amended Complaint, and upon joint motion, the court extended the discovery deadline by three weeks to December 21, 2015. (Doc. #35.) Sixteen days before that extension was to expire, on December 5, 2015, Plaintiff filed a Motion (Doc. #36) to again amend his complaint. Plaintiff sought to add a claim for failure to promote as well as a claim for hostile work environment. (Id.) After consideration of the arguments and case law surrounding such late amendments, the court allowed Plaintiff to amend his complaint to add a claim of hostile work environment under Section 1981, but did not permit any other amendment. (Doc. # 39.)

On January 1, 2016, Plaintiff filed his Second Amended Complaint (Doc. #40) alleging the following causes of action: (1) violations of Plaintiff's First Amendment free speech rights under 42 U.S.C. §§ 1983 and 1988 against all Defendants; (2) "unconstitutional prior restraint pursuant to 42 U.S.C. §§ 1983, 1988" against

"Defendants"[2]; (3) hostile work environment against "Defendants"[3]; and (4) abuse of process by Defendants.[4] (Id.) On January 20, 2016, Defendants filed their respective Answers (Docs. # 41 & 42) to the Second Amended Complaint.

Nine days later, on January 29, 2016, Defendants filed the instant Motions (Docs. # 43 & 45) for Summary Judgment. Defendants contend that all of Plaintiff's claims fail as a matter of law. Both parties have filed briefs and submitted evidence in support of their respective positions. Defendants submitted a briefs (Docs. # 44 & 46) and evidence[5] (Doc. # 47) in support of their own motions for summary judgment on January 29, 2016. On March 2, 2016, Plaintiff filed a brief (Doc. # 50)

---

[2] Plaintiff does not state specifically which "Defendants" to which this count refers; as such, the court assumes this count is against all Defendants.

[3] Again, Plaintiff does not state specifically which "Defendants" to which this count refers; as such, the court assumes this count is against all Defendants.

[4] The court also assumes this count is against all Defendants.

[5] Defendants submitted the following evidence in support of summary judgment: deposition of John Johnson; Chief Syx and City's Response to Plaintiff's First Set of Interrogatories; September 17, 2009 Johnson Grievance; September 29, 2009 Carter Memo; October 11, 2009 Hammonds email; October 2, 2011 email regarding requested meeting with Mayor May; Johnson's EEOC charge; EEOC Dismissal and Notice of Rights; Notice of Contemplated Disciplinary Hearing to Plaintiff; Hearing Rescheduling Memo; Plaintiff's Amended Written Statement; Notice of Johnson Disciplinary Action; Plaintiff's Appeal to PBJC; Notice of Disciplinary Action to Garner; Excerpt from Rules of PBJC, Rule 12; First Report of Injury; copies of disciplinary documentation for Sloan, Hammonds and Smith; and excerpts from deposition of Chief Syx.

and evidence[6] (Exhs. to Doc. #50) in opposition to Defendants's motions for summary judgment.  On March 9, 2016, Defendants filed briefs (Docs. # 51 & 53) in reply to Plaintiff's opposition.[7]

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its

---

[6]  Plaintiff submitted the following evidence in opposition to summary judgment: affidavit of Brian Pernell; affidavit of Jeremy Bellamy; deposition of Chief Paul Syx; and deposition of Mayor Kenneth Gulley.

[7]  With their reply briefs, Defendants also filed a Motion (Doc. #52) to Strike portions of Plaintiff's evidentiary submission in opposition to Summary Judgment. The court agrees with Defendants that the objected-to portions of the declarations offer testimony that is irrelevant, lacking in first-hand knowledge, speculative and otherwise inadmissible.  Many of the statements are merely conclusory, unsupported allegations that are riddled with hearsay and speculation. For these and the other reasons articulated by Defendants (see docs. # 52 & 60), the Motion (Doc. #52) to Strike is **GRANTED**.

burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not

6

controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand

a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[8]

Plaintiff John Johnson began his employment with the City as a firefighter in 1999. (Johnson Dep. at 17.) Johnson contends that has encountered multiple incidents of racial discrimination and harassment throughout his employment as a firefighter for the City of Bessemer.

### A. Alleged Racial Harassment at Station 1

Johnson was originally assigned to Fire Station 1. (Id. at 36-37.) While working at Station 1, Johnson saw a noose that was hung by another fire fighter. (Id. at 160.) Johnson is unsure exactly when he saw the noose, but he believes that it was in 2001 or 2002. (Id. at 160-61.) The noose was up for less than an hour, and Johnson was not aware of the circumstances surrounding why the firefighter hung the

---

[8] If the facts are in dispute, they are stated in a manner most favor to the non-movant. See Fitzpatrick, 2 F.3d at 1115.

noose. (Id. at 161-63.)  The noose was removed without Johnson complaining about it, and Johnson does not know who removed it.  (Id. at 178.)

At that same time at Station 1, there was a plywood board being used as a cover for the pool table.  (Def. Exh. 2 at 3.)  At one point, one side of the board had a confederate flag painted on it. (Id.) The board was typically covered with equipment, so that image was covered.  (Johnson Dep. at 177-78.)  At some point, the image of the confederate flag was painted over, and the board was removed in 2009, long after Johnson transferred to a different station.  (Id. at 169-70.)

Johnson testified that he believes that he had an informal conversation about the noose and/or the confederate flag with then-Captain Harold Wright, who is African American.  (Id. at 179-82.) Johnson thinks that the conversation occurred in the early 2000s, around the time that he saw the noose.  (Id. at 181.)  It is undisputed that Johnson did not file a complaint about the noose or the confederate flag.  (Id. at 179-80.)

## B.  Transfers to Station 2, 4 and 5

In 2004 or 2005, Johnson transferred to Station 2.  (Id. at 36-37.)  He remained at Station 2 for a couple of years and then transferred to Station 4.  (Id. at 37.)  There is no evidence in the record of any racist and/or harassment issues while Johnson was at Stations 2 and 4.  A few years later, in 2009, Johnson transferred to Station 5 where

he remains employed to date.  (Id. at 37, 287-88.)

## C.  Alleged Racial Harassment at Station 5

On September 7, 2009, Johnson was at Station 5 with his then-fiancé and infant son watching a television program called "Gangland."  (Id. at 192-93.)  This program discussed various gangs and included a discussion that some white supremacist gangs had adopted the swastika symbol.  (Id. at 194.)  Some point later, firefighter Scott Sloan, Caucasian, drew a diagram on the dry erase board in the station that included a swastika.  (Id. at 195.)  Lieutenant Mike Hammonds, Caucasian, and firefighter Adam Smith, Caucasian, were also present and involved in a conversation with Sloan when he drew the swastika.  (Id. at 212-13.)

Ten days later, on September 17, 2009, Johnson filed a formal, written grievance regarding the drawing of the swastika.  (Id. at 196, 199; Def. Exh. 3.)  In response, Deputy Chief Gary Cater, African American, conducted an investigation. (Johnson Dep. at 204.)  Following the investigation, on September 28, 2009, Deputy Chief Carter and Chief Paul Syx met with Johnson.  (Id. at 207-09; Def. Exh. 4.) Deputy Chief Carter informed Johnson that based on his investigation, he concluded that Sloan and the other officers involved did not subjectively intend any malice or hostility toward Johnson or his family.  (Def. Exh. 4.)  Because of the inappropriateness of the symbol and their lack of awareness as to its offensive nature,

Sloan, Hammonds and Smith were counseled and required to attend sensitivity training.  (Id.; Def. Exh. 17.)

At the end of the meeting, Johnson stated that he was satisfied with the City's actions.  (Def. Exh. 4.)  Deputy Chief Carter also invited Johnson to have his fiancé file a complaint about the incident if she wished.  (Id.; Johnson Dep. at 207-08.) There is no evidence that she ever filed a complaint.  (See Def. Exh. 4.)  Johnson requested to have a station-wide meeting regarding the incident, and Deputy Chief Carter told Johnson to talk to Captain Eidson to arrange the meeting.  (Id.)  Johnson, however,  did not follow up with Captain Eidson on the station-wide meeting.  (Id.; Johnson Dep. at 218.)

On October 2, 2009, Johnson sent an email to Chief Syx requesting to speak with then-Mayor Ed May about the swastika incident.  (Def. Exh. 6.)  Johnson stated in the email that he did not believe that "this matter was taken seriously so [he] [was] exercising [his] right to take this further."  (Id.)  At some point Johnson did have a meeting with then-Mayor Ed May about the incident.  (Id. at 216-17, 221-226.)

On October 10, 2009, Johnson met with Hammonds  and others on his shift to discuss the swastika incident.  (Johnson Dep. at 232-33.; Def. Exh. 5.)  Hammonds reported that the meeting went well and that their "willingness to come together and talk . . . enable[d] [them] to salvage [their] shift."  (Def. Exh. 5.)   Johnson also

11

suggested having a meeting with the Fire Department administration, and Hammonds agreed that such a meeting would be helpful.  (Johnson Dep. at 235; Def. Exh. 5.)  Chief Syx accepted the recommendation and scheduled a meeting for October 16, 2009.  (Johnson Dep. at 229-30.)  Johnson did not attend the meeting.  (Id.)

A few months later, on January 21, 2010, Johnson filed an EEOC charge alleging racial discrimination based on the swastika incident.  (Def. Exh. 7.)  The EEOC issued a Dismissal and Notice of Rights to Johnson on May 12, 2010, stating that it was unable to conclude that a violation of law had occurred.  (Def. Exh. 8.)  There is no evidence in the record that Johnson filed a lawsuit after receiving the Dismissal and Notice of Rights.

## D.  Facebook Incident and Resulting Suspension

On April 25, 2012, a firefighter named Jonathan Garner, Caucasian, posted remarks on his Facebook page regarding the shooting of Trayvon Martin.  (Second Am. Compl. ¶ 18.)  The post "resulted in a few days of back and forth arguments between [Garner] and a few fellow employees from the City of Bessemer."  (Id.)  Johnson viewed Garner's post as offensive and racist.  (Id.; Johnson Dep. at 255, 263.)

In response to the Facebook posts and comments, Johnson posted the following to his Facebook page while at home on April 30, 2012:

12

> WOW! THIS IS RIDICULOUS! I WORK AT A PLACE WHERE IT'S OK TO MAKE POLITICAL STATEMENTS VIA SOCIAL MEDIA, COMMUNICATIONS BOARDS, VERBAL COMMENTS, ETC SUCH AS POSTS ON FB, DRAWING SWASTIKS [sic] ON DRY ERASE BOARDS, EVEN TO HANGING A NOOSE UP IN THE MIDDLE OF A BUILDING! THE THING THAT IS MOST DISTURBING IS THAT IT IS ALLOWED! THE PEOPLE WHO ARE RESPONSIBLE FOR THOSE ACTS ARE NEVER HELD ACCOUNTABLE. BUT, AS SOON AS SOMEONE COMPLAINS THAT THESE ACTIONS ARE OFFENSIVE OR CAN BE VIEWED AS RACIST THEN THERE IS A PROBLEM….I MEAN COME ON PEOPLE, GROW THE HELL UP, GET YOUR HEAD OUT YOUR ASS! ANYONE EVER HEARD OF A HOSTILE WORKING ENVIRONMENT? I'M JUST SAYING….SUPPOSE THE SHOE WAS ON THE OTHER FOOT? NO NEED TO CALL NAMES, YOU KNOW WHO YOU ARE. BUT I CAN CALL NAMES. I AIN'T SCARED!

(Second Am. Compl. ¶ 19.)  Johnson's post was visible to all other Facebook users who are connected to his account as "friends," including at least five other Bessemer firefighters.  (Johnson Dep. at 251.)

One of the people who read the posts was Battalion Chief Eddy who called Battalion Chief Boyd to ask what was happening.  (Syx Dep. at 36.)  Boyd in turn advised Chief Syx about the Facebook posts and stated that there may be a problem. (Id.)  Upon hearing about the posts, Captain Carlton Jackson, who was in Chief Syx's office at the time, pulled up the posts via his Facebook account, and Chief Syx read

13

the posts.  (Id. at 37.)

Based on the Facebook post, on May 17, 2012, the City issued a Notice of Contemplated Disciplinary Hearing to Johnson which was delivered to Johnson by Chief Carter on May 21, 2012.  (Johnson Dep. at 265-66; Def. Exh. 9.)  The hearing was originally set for May 24, 2012, but was rescheduled and held on May 29, 2012, at Johnson's request.  (Def. Exh. 10.)   At the hearing and with the assistance of counsel, Johnson submitted a written and oral response to the charges.  (Johnson Dep. at 289-90; Def. Exh. 11.)

On June 22, 2012, the City issued a Notice of Disciplinary Action to Johnson informing him that he would be suspended for nine (9) days, or three (3) shifts - from June 26 until July 5, 2012.  (Johnson Dep. at 273-74; Def. Exh. 12.)  The Notice contained findings of fact, including, but not limited to the following:

> I find that you chose to make untrue statements in a public forum that creates a misconception that the City of Bessemer allows and tolerates discriminatory conduct in the workplace.  I find that you knew the statements were false at the time in which you made them and that said statements were derogatory, false, disrespectful, and constitute activity that is detrimental and in conflict with the City of Bessemer and its Fire Department.  These are direct violations of department rules and regulations are provided under Rule 12.2(c) and (l) of the Jefferson County Personnel Board.
> Your oral and written statements contain several inconsistencies and rely on misunderstandings of the rights

14

> that you have as an employee in the public service. Specifically, if an employee's comments are termed as them speaking only on matters of personal interest, then these are not entitled to constitutional First Amendment protection. Additionally, when an employee of public service speaks about a matter of public concern, an employer can restrict that speech if the topic relates to any matter of political, social or other concern to the community.
>
> I find that your Facebook posting addressed a matter of public concern, where you insinuate that a department of the City allows activities to take place which would otherwise prevent it from effectively and efficiently performing its intended function. . . . I find that these statements erode the integrity of the department and impair discipline by your superiors."

(Def. Exh. 12.)  Johnson served his suspension during those days without pay.

(Johnson Dep. at 277.)  Firefighter Garner was also suspended for nine (9) days, or

three (3) shifts, for his Facebook posts.[9]  (Id. at 284; Def. Exh. 14.)

Once he returned, on July 6, 2012, Johnson appealed the suspension to the

Personnel Board of Jefferson County.  (Id. at 277; Def. Exh. 13.)  A hearing was held

before a Hearing Officer in November of 2012.  (Second Am. Compl. ¶ 24.)  The

Hearing Officer first found that "both parties agree that Mr. Johnson's speech

addressed matters of public concern" and concluded as follows:

> After balancing the City of Bessemer's interest in quelling

---

[9] Additionally, the City issued a written warning to firefighter Ronnie Allen for his role in the events.  (Def. Exh. 2 at Response 6.)

15

> public discussion of racially divisive issues against Mr.
> Johnson's interest in free speech, this hearing officer must
> conclude that the latter is more compelling under
> <u>Pickering</u>. . . .  The evidence in this case does not show that
> Mr. Johnson's speech presented an imminent conflict or a
> significant threat to any interest of the City of Bessemer.
> The City of Bessemer has not met its burden in
> demonstrating that Mr. Johnson violated the Rules and
> Regulations of the Personnel Board of Jefferson County.

(<u>Id.</u>)  The Hearing Officer recommended that the Personnel Board reverse the decision to suspend Johnson.  (<u>Id.</u> ¶ 25.)

The matter was then heard by the Personnel Board on December 11, 2012.  (<u>Id.</u> ¶ 26.)  The Board "agree[d] that the Respondent's [speech] addressed a matter of public concern," but concluded that "[t]he Hearing Officer incorrectly found that the suspension should be reversed because there was no actual disruption to the City of Bessemer's function."  (<u>Id.</u>)  The Board found that "a showing of action disruption" is not required and upheld Johnson's suspension.  (<u>Id.</u>)  Johnson filed his complaint exactly two years later, on December 11, 2014.  (Doc. #1.)

## IV. Applicable Substantive Law and Analysis

As stated above, Plaintiff's Second Amended Complaint contains the following four claims: (1) violations of Plaintiff's First Amendment free speech rights under 42 U.S.C. §§ 1983 and 1988 against all Defendants; (2) "unconstitutional prior restraint

16

pursuant to 42 U.S.C. §§ 1983, 1988" against "Defendants"[10]; (3) hostile work environment against "Defendants"[11]; and (4) abuse of process by Defendants.[12] (Id.)

All three Defendants contend that (1) Johnson's section 1983 claims are due to be dismissed as time-barred; and (2) Johnson's hostile work environment claim is due to be dismissed as untimely.  In the alternative, with regard to the section 1983 claims, the individual Defendants contend that: (1) Chief Syx cannot be held individually liable for Johnson's suspension because he was not the "official decisionmaker"; and (2) Mayor Gulley and Chief Syx are entitled to qualified immunity.   As to Johnson's abuse of process claims against the Defendants, Defendant City contends that it fails as a matter of law because the City cannot be deemed to have acted with malice, because the process alleged here is not judicial, and/or because the claim is untimely.   The individual Defendants contend that Johnson's abuse of process claim fails because Mayor Gulley and Chief Syx are entitled to state agent immunity.

---

[10]  Plaintiff does not state specifically which "Defendants" to which this count refers; as such, the court assumes this count is against all Defendants.

[11]  Again, Plaintiff does not state specifically which "Defendants" to which this count refers; as such, the court assumes this count is against all Defendants.

[12]  The court also assumes this count is against all Defendants.

**A.  Plaintiff's Section 1983 Claims are Time-Barred.**[13]

In Counts I and II of his Second Amended Complaint, Plaintiff alleges violations of his First Amendment Free Speech Rights and "unconstitutional prior restraint," both brought pursuant to 42 U.S.C. § 1983.  Defendants contend that Counts I and II are barred because Johnson did not file his complaint until after the two-year statute of limitations on his claims had run.  (Doc. #44 at 10-15.) Specifically, Defendants argue that the statute of limitations began to run as of June 22, 2012, when Johnson learned of his suspension, and the limitations period was not tolled during the pendency of his elective administrative appeal.  (Id.)  Plaintiff disagrees and argues that the two-year statute of limitations did not begin to run until December 11, 2014, when his appeal to the Personnel Board was denied, because it was then that Plaintiff knew that he had in fact suffered an injury that formed the basis for his complaint. (Doc. #50 at 14-17.)  Therefore, the question before the court is whether the statute of limitations is tolled during an elective administrative appeal. The court agrees with Defendants that the statute did not toll for the following

---

[13] Even if the claims were not time-barred, Defendants Gulley and Syx are entitled to qualified immunity as to Johnson's section 1983 claims for the reasons stated by Defendants in their brief in support of summary judgment (Doc. # 46 at 5-19) and in their reply brief.  (Doc. # 53 at 5-14.)  The court adopts their arguments and reasoning in support of its finding that both individual Defendants are entitled to qualified immunity, as an alternative reason to grant summary judgment in favor of the individual defendants with regard to Plaintiff's Section 1983 claims.

reasons.

In deciding whether a plaintiff's claim for violation of his federal constitutional rights under 42 U.S.C. § 1983 is timely, the length of the plaintiff's statute of limitations is resolved by reference to state law. Wallace v. Kato, 549 U.S. 385, 388 (2007); Lovett v. Ray, 327 F.3d 1181, 1182 (11th Cir. 2003). The parties agree that in Alabama the limitations period for a section 1893 claim is two years, see Powell v. Thomas, 643 F.3d 1300, 1303 (11th Cir. 2011), but the length of the statute of limitations is not the debated issue in this case. The issue is when the claim accrues, when the statute of limitations begins to run, and whether the limitations period is tolled. For that issue, the court must look to federal law. See Witt v. Metropolitan Life Ins. Co., 772 F.3d 1269, 1275 (11th Cir. 2014)

Under federal law, a plaintiff's section 1983 action accrues and the limitations period begins to run when the plaintiff knows or has reason to know (1) that he/she has suffered the injury that forms the basis of his/her complaint and (2) who has inflicted the injury. Chappell v. Rich, 340 F.3d 1279, 1283 (11th Cir. 2003); Brown v. Georgia Bd. of Pardons & Paroles, 335 F.3d 1259, 1261 (11th Cir. 2003). In public employment cases, claims accrue when an employment decision is made and communicated to the plaintiff. See e.g., Delaware St. College v. Ricks, 449 U.S. 250, 258 (1980); Anderson-Free v. Steptoe, 970 F. Supp. 945, 953 (M.D. Ala. 1997).

Similarly, the statute of limitations for a First Amendment retaliation claim begins to run when the plaintiff becomes aware of the alleged retaliatory act. See Coates v. Natale, 409 F. App'x 238, 240 (11th Cir. 2010).

In the instant case, Johnson learned of his suspension on June 22, 2012, when he received the Notice of Disciplinary Action.  The Notice clearly explained the reasons for Johnson's suspension, including the Facebook post at issue and how that post violated workplace rules.  (See Def. Exh. 12.)  Therefore, Johnson was informed of all facts necessary for a First Amendment retaliation claim based on his suspension on June 22, 2012, and the statute of limitations on his claim began to run on that date. The two year limitations period for Johnson's section 1983 claim expired on June 22, 2014, six months before Johnson filed his complaint.

Johnson argues, however, that the statute should not begin to run until December 11, 2014, when his appeal to the Personnel Board was final and his suspension was upheld.  The court disagrees.  Although the court cannot find any case law from the Eleventh Circuit addressing the specific facts in this case, in general, the law of this circuit precludes tolling where exhaustion of administrative remedies is not a prerequisite to filing suit.  For instance, in the earliest case addressing this issue, Bryant v. Potts, 528 F.2d 621 (5th Cir.  1976), the former Fifth Circuit in  held that the plaintiff's pursuit of administrative remedies would not interrupt the limitations

period for filing a section 1983 action, where exhaustion of such remedies is not a prerequisite. Id. at 622.

Additionally, in Smith v. McClammy, 740 F.2d 925 (11th Cir. 1984), the plaintiff, a college instructor in Alabama, argued that the statute of limitations governing her section 1983 claim stemming from her termination of employment should be tolled during the pendency of her state administrative proceedings before the Alabama Education Association. See id. at 927. The Eleventh Circuit, noting that exhaustion of administrative remedies is not a prerequisite to filing a section 1983 action in federal court, rejected this argument, and held that the statute began to run on the date of accrual of the plaintiff's cause of action. See id.

Similarly, in Black v. Broward Employment & Training Admin., 846 F.2d 1311 (11th Cir. 1988), a former employee of an agency organized to administer grants under the Comprehensive Employment and Training Act of 1973 (CETA) brought suit against the agency under Title VII and section 1983 for sex discrimination pertaining to her termination. Id. The plaintiff argued that running of the applicable statute of limitations was tolled while she pursued her federal administrative remedies under CETA. Id. at 1312. On appeal, the Eleventh Circuit found that exhaustion of federal administrative remedies under CETA was not required prior to bringing suit under section 1983. Id. at 1312–14. Because exhaustion was not a prerequisite, the

21

court held that the limitations period was not tolled while the plaintiff pursued her elective administrative proceedings under CETA. Id. at 1314.

All that being said, however, the court did find one case that is in apparent conflict with this general statement of law in the Eleventh Circuit. In Rubin v. O'Koren, 644 F.2d 1023 (5th Cir. Unit B 1981), an instructor challenged her termination by the University of Alabama in federal district court under section 1983. She brought her lawsuit more than a year and a half after her last day of employment with the university, but argued that her claims were not time-barred because the applicable one-year limitation period should have been tolled for the duration of administrative grievance proceedings. Id. at 1025. The Court began its analysis by stating that it must look to state tolling law to determine whether the running of a statute of limitations should be suspended. Id. (citing Board of Regents v. Tomanio, 446 U.S. 478, 483 (1980) (noting that under Supreme Court precedent federal courts are obligated not only to apply analogous state statutes of limitations where a federal statute supplies no limitations period, but also to apply state tolling rules). Using this general rule as a starting point, the Court looked to Alabama law and cited Jefferson County v. Reach, 368 So.2d 250 (Ala. 1978) for the proposition that under Alabama law the pursuit of a grievance procedure tolls the applicable statute of limitations. Id. at 1205-06. The Court further noted that such tolling was consistent with the federal

policies underlying section 1983, as required by the Supreme Court in <u>Tomanio</u>. <u>Id.</u>
In accordance with the holding in <u>Reach</u> and its conclusion that the Alabama tolling
procedure is fully consistent with section 1983, the Court concluded that the
plaintiff's pursuit of administrative proceedings tolled the one-year limitations period
and that her action therefore was timely. <u>Rubin</u>, 644 F.2d at 1026.

Therefore, contrary to the concise statement of law regarding tolling presented
by Defendants, the court is confronted with an apparent conflict within the Eleventh
Circuit as to whether an elective administrative appeal tolls the statute of limitations
for a section 1893 claim.[14]  That being said, the court sees a slight distinction in
<u>Rubin</u> from the other cases.  What distinguishes <u>Rubin</u> from <u>Bryant</u>, <u>Smith</u> and <u>Black</u>
discussed above, however, is that the reliance on <u>Reach</u> seems to be misplaced.  As
stated, pursuant to the requirement that federal courts look to state tolling law in
determining whether the running of a state's statute of limitations should be
suspended, the Court in <u>Rubin</u> cited <u>Reach</u> for the proposition that under Alabama
law the pursuit of a grievance procedure tolls the applicable statute of limitations.
However, in <u>Reach</u>, the Alabama Supreme Court appears to have been interpreting
federal, not state, law, in concluding that tolling was warranted under section 1983.

_____

[14]  The court notes that neither decision in <u>Smith</u> or <u>Black</u> discuss the apparent conflict
with the Court's earlier decision in <u>Rubin</u>.  Similarly, the <u>Rubin</u> decision does not discuss the
former Fifth Circuit's decision in <u>Bryant</u>, which predated it and seems to directly contradict it.

23

At issue was a due-process claim, and the principal cases relied upon in Reach were cases, primarily federal, addressing federal tolling issues, see, e.g., Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 258 (5th Cir. 1974); Coppotelli v. Howlett, 76 F.R.D. 20 (E.D.Ill. 1977); Hunter v. United States, 417 F.Supp. 272 (N.D.Cal. 1976). Because Reach was essentially attempting to articulate a broad federal, and not a state, tolling principle, this court does not find that Tomanio compels federal courts to follow this principle.

Additionally, the court is aware that with inconsistent holdings within the circuit, it is bound to follow the rule articulated in the earliest panel opinion, here Bryant (as subsequently applied in Smith and Black) rather than the inconsistent decision in Rubin. As the Eleventh Circuit has reiterated, "[w]here there are inconsistent panel decisions, 'the earliest panel opinion resolving the issue in question binds this circuit until the court resolves the issue en banc.'" Combs v. Plantation Patterns, 106 F.3d 1519, 1532 (11th Cir. 1997) (quoting United States v. Dailey, 24 F.3d 1323, 1327 (11th Cir. 1994)).

Although the court is troubled by the unexplained inconsistency of the Eleventh Circuit precedent, two things weigh in heavy favor of not tolling the statute of limitations in this case: (1) Rubin's referral to state tolling law and (2) the earliest case rule mandate. Therefore, because Johnson did not file his original complaint

24

until December 11, 2014, and the statute of limitations did not toll during Johnson's elective administrative appeal, Counts I and II of the Second Amended Complaint are due to be dismissed as untimely, and judgment is due to be granted in favor of all Defendants on these claims.[15]

**B.  Plaintiff's Hostile Work Environment Claims are Due to Be Dismissed.**

Count II of the Second Amended Complaint alleges a claim for hostile work environment based on Johnson's race.  Although Defendants argue that the Second Amended Complaint does not specify what law Johnson attempts to travel under in support of his claim, in ruling on Plaintiff's December 5, 2015 Motion (Doc #36) to Amend the Complaint, the court specifically allowed Plaintiff to amend his complaint to add a claim for hostile work environment under Section 1981.  (Doc. # 39 at 7.) As such, the court construes the claim as brought only under Section 1981 and not under Title VII.

Under section 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings

---

[15] Plaintiff's reliance on the Heck doctrine is misplaced.  (See doc. #50 at 14-17.)  The Supreme Court's holding in Heck v. Humphrey, 512 U.S. 477 (1994) regarding section 1983 challenging criminal convictions has absolutely no bearing on the timeliness of Plaintiff's section 1983 claims in this case.

for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a) (1994).  Thus, section 1981 prohibits discrimination on the basis of race in making and enforcing contract, including the conditions of employment.  The statute of limitations for a section 1981 claim is four years.  Price v. M&H Valve Co., 177 F. App'x 1, 9-10 (11th Cir. 2006).  There is no administrative prerequisite to bringing suit under section 1981.  Id.

Johnson filed his original complaint on December 11, 2014.  (Doc. #1.) Therefore, for his section 1981 claim to be timely, it must be premised on acts that occurred after December 11, 2010.  None of his allegations fall in the prescribed time frame.

Johnson's Second Amended Complaint points to three discrete, isolated incidents in support of his hostile work environment claim.[16]  First, he complains that in approximately 2001 or 2002, a noose was displayed in the rafters when he worked at Station 1.  (Doc. #40 ¶¶ 15, 56.)  Second, he alleges that at Station 1 there was a pool table that had a plywood cover with the confederate flag painted on it. (Id. ¶¶ 5, 14.)  The final incident was when a swastika was drawn on a dry erase board on September 7, 2009. (Id. ¶ 7.)   None of these incidents occurred after December 11, 2010, and, therefore, his claim for hostile work environment under section 1981 is

---

[16]  Each of these incidents are described in detail in Section III. A. and C.

untimely.   Accordingly, summary judgment is due to be granted in favor of Defendants as to Plaintiff's claim for hostile work environment.[17]

## C.  Plaintiff's Abuse of Process Claims are Due to be Dismissed.

Plaintiff's last count in his Second Amended Complaint is for Abuse of Process against Defendants.  (Doc. #40 ¶¶ 59-63.)  Plaintiff alleges that "Defendant Eidson seeking out the Plaintiff's Facebook page and then bringing a charge against him is an abuse of the disciplinary process of the Bessemer Fire Department because a black employee was punished while a similarly situated white employee was given a pass for far more egregious misbehavior."  (Id. ¶ 61.) Plaintiff further alleges that "Eidson purposefully used the disciplinary process to retaliate against Johnson. Eidson took it upon himself to take a benign comment and punish the Plaintiff for simply pointing out the racism that exists within the department."  (Id. ¶ 62.)

### 1.  Plaintiff Abandoned his  Claim for Abuse of Process Against the City.

The City argues in its brief (Doc. #44) in support of summary judgment that Count IV of Plaintiff's Second Amended Complaint for abuse of process is due to be

---

[17]   Additionally, the court notes that Plaintiff did not address his claim for hostile work environment in his brief (Doc. #50) in opposition to summary judgment.  As such, the court deems this claim abandoned.  See, e.g., Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1326 (11th Cir. 2000) (a party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned).

dismissed for the following reasons: (1) it is time-barred against all Defendants under the two-year statute of limitations of Ala. Code § 6–2–38(l) (1975); (2) it is barred as a matter of law against all Defendants because Alabama has not recognized a claim based on an alleged abuse of an administrative, as opposed to judicial, process; (3) Plaintiff cannot hold the City liable for an abuse of process claim because a City cannot be deemed to act with malice under Ala. Code § 11–47–190.; and (4) Plaintiff lacks any evidence that any of the Defendants used the City's internal disciplinary process "improperly." (Doc. # 44 at 20-24). Plaintiff's opposition brief (Doc. #50) fails to discuss this claim against the City and does not respond to the multiple arguments articulated by the City why the claim should be dismissed. (See Doc. # 44 at 20-24.) As such, the court deems this claim abandoned and summary judgment is due to be granted in favor of the City as to Plaintiff's claim for abuse of process. See, e.g., Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1326 (11th Cir. 2000) (a party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned).

### 2. Plaintiff's Claims for Abuse of Process Against Mayor Gulley and Paul Syx are Due to be Dismissed under the Doctrine of State Agent Immunity.

The individual defendants contend that Plaintiff's claim for abuse of process against them is due to be dismissed because they are entitled to state agent immunity.

(Doc. # 46 at 19-22; Doc. # 53 at 14-16.)  Plaintiff counters that state agent immunity does not apply and argues that "there is a genuine issue of material fact as to whether or not the conduct of the Defendants has violated the United States Constitution and particularly 42 U.S.C. § 1983 or whether they have acted beyond their authority or mistaken their interpretation of the law in suspending Plaintiff as a fireman for the City of Bessemer."  (Doc. #50 at 23.)  Plaintiff additionally argues that "whether the Mayor and Fire Chief had acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under mistaken interpretation of the law" is also a question of fact.  (Id.)  Therefore, according to Plaintiff, "nothing in the state agency immunity consideration can be applied to the Defendants' conduct."  (Id.)

State-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities."  Ex parte Hayles, 852 So.2d 117, 122 (Ala. 2002). In Ex parte Cranman, 792 So.2d 392, 405 (Ala. 2000), the Alabama Supreme Court articulated the following test for state-agent immunity:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
> . . .
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

> (a) making administrative adjudications;
> . . .
> (d) hiring, firing, transferring, assigning, or supervising
> personnel . . . .

792 So.2d at 405 (emphasis in original).  The Court further explained when a state

agent is not immune from suit:

> Notwithstanding anything to the contrary in the foregoing
> statement of the rule, a State agent *shall not* be immune
> from civil liability in his or her personal capacity
>
> (1) when the Constitution or laws of the United States, or
> the Constitution of this State, or laws, rules, or regulations
> of this State enacted or promulgated for the purpose of
> regulating the activities of a governmental agency require
> otherwise; or
>
> (2) when the State agent acts willfully, maliciously,
> fraudulently, in bad faith, beyond his or her authority, or
> under a mistaken interpretation of the law.

Id. (emphasis in original).  When a defendant asserts state agent immunity, a burden-

shifting process applies.  Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala.

2006).  First, the burden is on the defendant to demonstrate that the plaintiff's claims

"arise from a function that would entitle the State agent to immunity."  Id.   After

making such a showing, "the burden shifts to the plaintiff to show that one of two

categories of exceptions to the State-agent immunity recognized in Cranman is

applicable."  Ex parte Kennedy, 992 So.2d 1276, 1282 (Ala. 2008).

Based on the undisputed facts, both Chief Syx, as head of the Fire Department, and Mayor Gulley, as appointing authority for the City, were performing discretionary functions under <u>Cranman</u>. Chief Syx was exercising his judgment in the administration of the Fire Department when overseeing the investigation of a firefighter under his supervision. Mayor Gulley was exercising his judgment in the administration of the Fire Department when he made an administrative adjudication as to whether Johnson violated applicable workplace rules.  As such, both men were engaged in exactly the kind of conduct which qualifies them for immunity.  The burden, therefore, shifts to Plaintiff to show that one of the two exceptions under <u>Cranman</u> for defeating immunity applies.  This Johnson cannot do.

Johnson's sole argument, as articulated in above, is that there is an issue of fact as to whether one of the two exceptions applies.   Plaintiff does not point to any specific facts or evidence before the court in support of his argument, but instead makes sweeping, self-serving unsupported statements that both exceptions apply. (See doc. # 50 at 23.) Such statements are insufficient to establish that one of the two <u>Cranman</u> exceptions applies.  Accordingly, Plaintiff has failed in his burden of putting forth substantial evidence that could establish that Chief Syx and Mayor Gulley are not entitled state agent immunity.  Therefore, Plaintiff's claim for abuse of process as to the individual defendants is due to be dismissed because they are

31

entitled to state agent immunity.

## V.  Conclusion

In summary, the court finds that no material issues of fact remain and that Defendants City of Bessemer, Mayor Kenneth Gulley and Chief Paul Syx are entitled to judgment as a matter of law as to all claims asserted by Plaintiff.  A separate order will be entered.

**DONE** this the __12th__ day of April, 2016.

_____

SENIOR UNITED STATES DISTRICT JUDGE